# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON

### Assigned on Briefs January 5, 2011

## STATE OF TENNESSEE v. BRIAN HERVERY

**Direct Appeal from the Criminal Court for Shelby County**
**No. 08-07627     James C. Beasley, Jr., Judge**

**No. W2010-00675-CCA-R3-CD  - Filed March 31, 2011**

The defendant, Brian Hervery, was convicted by a Shelby County Criminal Court jury of attempted second degree murder, a Class B felony; three counts of aggravated assault, a Class C felony; and one count of the employment of a firearm during the commission of a dangerous felony.  The trial court merged one of the convictions of aggravated assault into the conviction for attempted second degree murder and sentenced the defendant as a Range I offender to concurrent terms of ten years for the attempted murder conviction and three years for the aggravated assault convictions.  Because the defendant had a prior conviction for voluntary manslaughter, the court sentenced him to ten years at 100% for the firearm conviction and ordered that the sentence be served consecutively to the ten-year sentence for attempted murder, in accordance with Tennessee Code Annotated section 39-17-1324.  The defendant raises four issues on appeal:  (1) whether the trial court erred by granting the State's motion in limine to exclude evidence that would have shown the victims' bias; (2) whether the trial court erred by not declaring a mistrial following the prosecutor's improper closing comments; (3) whether the evidence was sufficient to sustain the convictions; and (4) whether the trial court imposed an excessive sentence.  Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which J.C. MCLIN and CAMILLE R. MCMULLEN, JJ., joined.

Vicki M. Carriker (on appeal); Greg Carmen and Samuel Rodriguez, III (at trial), Memphis, Tennessee, for the appellant, Brian Hervery.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; William L. Gibbons, District Attorney General; and Damon Griffin, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## FACTS

Early on the morning of May 23, 2007, Stephanie Turner and her children, Terry Paige and Tiamberly Turner, had just returned to their Memphis apartment complex and were looking at photographs inside their vehicle when an individual they knew as "Big Man" stepped out from behind their apartment building and began firing gunshots at them. Each of the three victims subsequently identified the defendant as the assailant from separate photographic lineups they were shown by the police. As a result, on December 2, 2008, the Shelby County Grand Jury returned an indictment charging the defendant with the attempted second degree murder of Terry Paige, the aggravated assaults of Terry Paige, Stephanie Turner, and Tiamberly Turner, and the employment of a firearm during a felony.

At the defendant's November 2009 trial, Stephanie Turner testified that early on the morning of the shooting she picked up her children, sixteen-year-old Terry and seventeen-year-old Tiamberly, and her cousins, eighteen-year-old Christy and her nineteen-year-old brother, Jarvis, from a party where they had been celebrating Christy's high school graduation. Christy and Jarvis lived on the opposite end of the same apartment complex, and she and her children dropped them off at their apartment between 1:30 a.m. and 1:40 a.m. before driving to their own apartment, which was located approximately three to five minutes' walk away. As she was dropping Christy and Jarvis at their apartment, she noticed a group of men sitting on a wall and the defendant standing by the mailboxes. Because she was curious, she lowered her window to get a better view, and the defendant looked directly at her. She then drove to her apartment and parked her vehicle.

Turner testified that her son, who was in the backseat, exited the car and started toward their apartment but returned to the vehicle when she called him back to look at photographs of the graduation party that her daughter was showing her. She said he was leaning inside the open front passenger door looking at the photographs when she saw the defendant step out from behind their apartment building. The area was well-lit, and she kept her eyes on the defendant because she found his behavior odd. Turner described what next occurred:

> And I was just -- I was looking at him and I was like, you know, it was a curiosity, I was like, what is he doing, you know, I didn't think nothing of it. And I didn't take my eyes off of him because it was strange that he [would] just step out there and be standing there at that time of morning. And as I looked, I seen his arm go up and I just heard a shot and I see [sic] the fire come from the gun. And my first instinct was to just lean over, you know, in case --

I'm knowing he's shooting in our direction from the way his arm was pointing.

Turner testified that she was terrified for her own life and for the lives of her children. She said that her son reacted to the shooting by diving through the passenger door of the vehicle and knocking her through the open driver's door onto the ground with himself on top of her. He then began making his way around the back of the car while she reached back inside the vehicle, grabbed her daughter, and pulled her out onto the ground beside her. She then called 9-1-1.

Turner testified that she heard a total of four to five gunshots before the shooting stopped and that she remained on the ground until her son told her that the defendant had gone. She and the children then fled the area in her vehicle until they encountered and stopped a police officer, who followed them back to the apartment.

Turner identified the photographic array from which she had identified the defendant to the police as the shooter and explained that she circled his photograph multiple times because she was one hundred percent positive of her identification. She also identified a photograph showing a bullet hole in the front passenger door of her vehicle. She said that, on the night of the shooting, she identified the defendant to the police as an individual who was known throughout the apartment complex by the nickname "Big Man."

Turner's son, Terry Paige, testified that his cousin, Christy, pointed the defendant out to them as they were letting her and her brother out at their apartment. A few minutes later, Paige was standing outside his own apartment beside the open passenger's door of his mother's parked vehicle when he heard the "boom" of a gunshot and "felt some fire" hit his back. At that point, he dived over his sister in the passenger seat, landing on top of his mother and knocking her through the open driver's door onto the ground. He then worked his way around to the back of the vehicle, where he was able to see the defendant shooting a gun. Paige testified that the defendant appeared to be aiming at him: "I see him, so I'm moving to the back of the car, side to side, and he followed me every which way I go like he's trying to aim and shoot me." Paige stated that he called out to the defendant, "[P]lease don't kill me, man" and that the defendant stopped for a minute and then ran off.

Paige estimated that the defendant fired four to five gunshots in total. He said the defendant had a gun in his hand, but he was unable to tell what type of gun it was. He identified the May 27, 2008 photographic array from which he had positively identified the defendant to the police as the shooter and expressed his absolute certainty in his identification of the defendant as his assailant. He also identified the baseball cap he had been wearing at the time of the shooting, which, after the shooting, had two bullet holes in the back.

Turner's daughter, Tiamberly Turner, who also identified the defendant as the shooter in a photographic array she was shown by the police, essentially corroborated her mother's and her brother's accounts of the shooting. She acknowledged on cross-examination, however, that she never actually saw the shooter but instead relied on information relayed to her during the shooting by her mother and her brother.

Christy Jones testified that she noticed the defendant standing by the mailboxes when Turner dropped her off at her apartment and that she pointed him out to the others.

Memphis Police Officer Alpha Hinds of the Crime Scene Unit testified that she found a bullet hole in the front passenger door of Turner's vehicle and a baseball cap with two bullet holes on the ground near the vehicle.

Detective John Byars of the Memphis Police Department's Felony Assault Unit testified that he received an anonymous Crime Stoppers' tip identifying the defendant, aka "Big Man," as the shooter. In response, he put together a photographic spreadsheet with the defendant's photograph, from which each of the three victims made a positive identification of the defendant.

The defendant elected not to testify and rested his case without presenting any proof. Following deliberations, the jury convicted him of the indicted offenses.

At the sentencing hearing, the twenty-five-year-old defendant denied that he was guilty of the offenses and suggested that the victims had identified him as the shooter because they were prejudiced against him. He then explained that three of the victims' family members had been involved in two different earlier shooting incidents with his cousin and his friend.

The defendant further testified that he had entered a best interest guilty plea to voluntary manslaughter in exchange for a six-year sentence when he was fourteen years old. He acknowledged he had a prior misdemeanor conviction for possession of marijuana, for which he had successfully completely probation, as well as charges for assault and drug paraphernalia, which had been nolle prosequied or dismissed. He stated that he had left school in the eighth grade and had never gotten his GED, but he had earned the following certificates through his participation in programs offered at the jail: anger management, life skills, moral recognition therapy, and "commitment to change." As for his social and employment history, he testified that he was the father of a four-year-old son and had worked intermittently as a landscaper since 1997.

At the conclusion of the hearing, the trial court merged the conviction for aggravated assault against Paige into the conviction for attempted second degree murder. The court

-4-

found three enhancement factors applicable to the attempted murder conviction: the defendant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish his range; the offense involved the threat of death or serious bodily injury to another person and the defendant had previously been convicted of a felony that resulted in death or serious bodily injury; and the defendant employed a firearm during the commission of the offense. See Tenn. Code Ann. § 40-35-114(1), (9), (11) (2010). The trial court found two enhancement factors applicable to the aggravated assault convictions: the defendant had a previous criminal history, and the crime involved the threat of death or serious bodily injury to another person. The court applied as a mitigating factor to all the convictions the defendant's completion of the numerous life improvement programs offered through the jail. See id. § 40-35-113(13). Based on its weighing of the enhancement and mitigating factors, the trial court sentenced the defendant as a Range I, standard offender to concurrent terms of ten years for the attempted murder conviction, which was two years beyond the minimum sentence in the range, and to the minimum sentence of three years for each of the aggravated assault convictions. Finally, the trial court sentenced the defendant to ten years for his firearm conviction and ordered that it be served consecutively to his ten-year sentence for the underlying dangerous felony, pursuant to statute. See Tenn. Code Ann. § 39-17-1324(e)(1) and (h)(2) (providing that the sentence for employment of firearm during commission or attempt to commit dangerous felony shall be served consecutively "to any other sentence the person . . . is sentenced to serve for conviction of the underlying dangerous felony" and that the offense "is a Class C felony, punishable by a mandatory minimum ten-year sentence to the department of correction, if the defendant, at the time of the offense, had a prior felony conviction").

## ANALYSIS

### I. Exclusion of Evidence of Victims' Bias

The defendant contends that the trial court erred by not allowing him to cross-examine the victims about their knowledge of two earlier shooting incidents between their relatives or associates and the defendant's relatives. Questions concerning the admissibility of evidence generally rest within the sound discretion of the trial court, whose decisions will not be overturned on appeal absent a clear showing of an abuse of discretion. State v. Lewis, 235 S.W.3d 136, 141 (Tenn. 2007). We review this issue, therefore, under an abuse of discretion standard.

The record reveals that the State filed a motion in limine on October 30, 2009, requesting that the trial court exclude the evidence on the grounds that it was irrelevant to the

issues at trial.[1]  At the hearing, the trial court ruled that the evidence was irrelevant and inadmissible but that it would reconsider the issue at trial depending on the defendant's proof. At trial, the court reaffirmed its earlier ruling but allowed the defendant to make a jury-out offer of proof at the conclusion of each victim's testimony. Stephanie Turner testified during her offer of proof that she was familiar with Martez Wilson, who was the boyfriend of her cousin, Daphne Burks.  She denied, however, that she ever told the police that the defendant had shot at them because Wilson had earlier shot the defendant's cousin-in-law, Calvin Triggs, also known as "Yahtzee," and the defendant's cousin, Larry Brown.  Instead, she said she knew nothing about those shootings and was not even acquainted with Triggs or Brown.

Paige testified that he was aware of Wilson's shooting of the defendant's cousin-in-law at the same apartment complex earlier that day and that he informed the police about it.  He had also heard that Wilson had shot the defendant's cousin but knew nothing about it other than what he had heard.  He said he was not with Wilson at the time of the shootings.

Tiamberly Turner testified that she had heard that Wilson had shot the defendant's cousin-in-law, "Yahtzee," and that she informed the police about what she had heard.  She said she had also heard that the shooting occurred near the home of her aunt, Maddie Jones, and that her brother, Terry, was at her aunt's home at the time.

The defendant argues that the prior altercations were relevant to show the victims' bias as well as his intent at the time of the shooting.  In response, the State argues that the trial court properly ruled that the proof was too remote to be relevant.  We agree with the State.

Rule 616 of the Tennessee Rules of Evidence provides that "[a] party may offer evidence by cross-examination, extrinsic evidence, or both, that a witness is biased in favor of or prejudiced against a party or another witness."  Evidence which is not relevant, however, is not admissible at trial.  "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Tenn. R. Evid. 401.  We agree with the trial court that the shootings about which the defendant sought to cross-examine the victims, which two of the victims had heard about but which did not directly involve either the victims or the defendant, were too remote to be relevant to any issue at trial. We conclude, therefore, that the trial court did not abuse its discretion in granting the State's motion in limine to exclude the evidence.

---

[1] At the pretrial hearing on the motion, defense counsel informed the court that the two prior shooting incidents occurred at the same apartment complex on May 11 and May 22, 2007, while the shooting at issue in this case occurred on May 23.

## II. Failure to Declare Mistrial

The defendant contends that the trial court erred by not declaring a mistrial in response to the prosecutor's improper closing comment. Whether to declare a mistrial lies within the sound discretion of the trial court, and its decision in this regard will not be overturned on appeal absent a showing of an abuse of discretion. State v. Land, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000). A mistrial should be declared in a criminal case only when something has occurred that would prevent an impartial verdict, thereby resulting in a miscarriage of justice if a mistrial is not declared. See id. (citing State v. McPherson, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994)); State v. Jones, 15 S.W.3d 880, 893 (Tenn. Crim. App. 1999) (citing Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977)). "Generally a mistrial will be declared in a criminal case only when there is a 'manifest necessity' requiring such action by the trial judge." State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991) (quoting Arnold, 563 S.W.2d at 794). The burden to show the necessity for a mistrial falls upon the party seeking the mistrial. Land, 34 S.W.3d at 527 (citing State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996)).

Tennessee courts "have traditionally provided counsel with a wide latitude of discretion in the content of their final argument" and trial judges with "wide discretion in control of the argument." State v. Zirkle, 910 S.W.2d 874, 888 (Tenn. Crim. App. 1995). A party's closing argument "must be temperate, predicated on evidence introduced during the trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Middlebrooks, 995 S.W.2d 550, 557 (Tenn. 1999). The five generally recognized areas of prosecutorial misconduct in closing argument occur when the prosecutor intentionally misstates the evidence or misleads the jury on the inferences it may draw from the evidence; expresses his or her personal opinion on the evidence or the defendant's guilt; uses arguments calculated to inflame the passions or prejudices of the jury; diverts the jury from its duty to decide the case on the evidence by injecting issues broader than the guilt or innocence of the accused under the controlling law or by making predictions on the consequences of the jury's verdict; and intentionally refers to or argues facts outside the record, other than those which are matters of common public knowledge. State v. Goltz, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003).

For a defendant to be entitled to a new trial on the basis of allegedly improper remarks during the closing argument, the remarks must be shown to have prejudiced the case by affecting the jury's verdict. Middlebrooks, 995 S.W.2d at 559. In determining whether this occurred, we consider the following factors: (1) the conduct viewed in light of the circumstances and facts in the case; (2) any curative measures taken by the trial court and the prosecution; (3) the prosecutor's intent in making the improper statements; (4) the cumulative effect of the prosecutor's statements and other errors in the record; and (5) the relative

strength and weakness of the case.  Id. at 560.

We find no abuse of discretion in the trial court's denial of the defendant's request for a mistrial.  The record reveals that the complained-of comment occurred in the midst of the prosecutor's initial closing remarks as he was arguing that the jury should find the defendant guilty of the offense of employing a firearm during the commission of a dangerous felony.  After arguing that the defendant committed a dangerous act by attempting to kill Paige with the gun, the prosecutor began his next sentence by asking the jury to put themselves in the position of Stephanie Turner. Defense counsel interrupted with an objection and, in the bench conference that followed, requested a mistrial.  The trial court denied the request but ruled that the comment was improper and instructed the prosecutor to refrain from any further similar comments.  Defense counsel did not request a curative instruction, and the prosecutor thereafter continued with his fairly lengthy closing argument without making any similar remarks.  Given the strength of the State's case and the fact that the comment comprised only a very brief portion of the entire closing argument, we conclude that it could not have affected the jury's verdict.

### III.  Sufficiency of the Evidence

The defendant next challenges the sufficiency of the evidence in support of his convictions, arguing that the State failed to prove beyond a reasonable doubt his identity as the perpetrator of the crimes.  The State responds by arguing that there was sufficient proof to establish the defendant's identity beyond a reasonable doubt.  We agree with the State.

When the sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact.  See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).  "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State."  State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973).  Our supreme court stated the rationale for this rule:

This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

When viewed in the light most favorable to the State, the evidence at trial was more than sufficient to establish the defendant's identity as the perpetrator of the crimes. The defendant points out that there was no physical evidence linking him to the crimes and that the victims, before the anonymous Crime Stoppers' tip, were unable to identify him to the police. The defendant ignores the fact that the victims identified him to the police immediately after the shooting as an individual they knew from the neighborhood as "Big Man." The victims' having initially identified him by his nickname rather than his proper name does not render their identification any less reliable. Furthermore, although Turner's daughter acknowledged that she never saw the shooter, both Turner and Paige testified that they had a clear view of the shooter and were confident in their identification of him as the individual they knew as "Big Man." Paige testified that he saw a gun in the defendant's hand, and Turner testified that she saw the defendant raise his arm and point it in their direction before hearing the sound of a gunshot and seeing a flash of fire from the weapon. A victim's identification of a defendant as the perpetrator of an offense is, alone, sufficient to establish identity. See State v. Hill, 987 S.W.2d 867, 870 (Tenn. Crim. App. 1998); State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993). We conclude, therefore, that the evidence was sufficient to sustain the defendant's convictions.

**IV. Sentencing**

The defendant contends that the trial court imposed an excessive sentence by erroneously applying enhancement factors in violation of Blakely v. Washington, 542 U.S. 296 (2004), and by not applying any factors in mitigation. He further argues that the aggregate twenty-year sentence does not reasonably relate to the severity of the offenses,

especially given his young age at the time of the shooting and the fact that no one was injured.

When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2010). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994); State v. Bonestel, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000).

In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statistical information provided by the administrative office of the courts as to Tennessee sentencing practices for similar offenses, (h) any statements made by the accused in his own behalf, and (i) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210; State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169.

The defendant first argues that the trial court's use of enhancement factors to enhance his sentences violated his constitutional rights under Blakely. He is mistaken. Our revised sentencing statutes, which provide that a trial court, in imposing a specific sentence within a range, "shall consider, but is not bound by" certain advisory sentencing guidelines, including that "[t]he sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors," Tenn. Code Ann. § 40-35-210(c)(2), does not run afoul of Blakely. Furthermore, under the revised sentencing statutes the weighing of the various mitigating and enhancement factors is "left to the trial court's sound discretion." State v. Carter, 254 S.W.3d 335, 345 (Tenn. 2008). Thus, a trial court may appropriately set a sentence anywhere within the applicable range so long as the sentence is consistent with the principles and purposes of the Sentencing Act.

The defendant is also mistaken in his assertion that the trial court failed to consider any factors in mitigation. In its sentencing determinations, the trial court stated that it did not find

any of the specific statutory mitigating factors applicable but that it was taking into account the defendant's completion of the numerous life improvement programs offered at the jail.

Although the defendant does not raise it as an issue on appeal, we believe that the trial court should not have applied enhancement factor (9), that the defendant possessed or employed a firearm during the commission of the offense, to the defendant's attempted murder conviction because the defendant was separately indicted and convicted of the offense of employing a firearm during the commission of the attempted murder. We conclude, however, that the remaining enhancement factors justify the enhanced ten-year sentence, which falls within the range for a Range I offender convicted of a Class B felony, see Tenn. Code Ann. § 40-35-112(a)(2) (2010). We further conclude that the defendant has not shown that the aggregate twenty-year sentence does not reasonably relate to the severity of the offenses.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE